UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF TENNESSEE
NASHVILLE DIVISION

| | | |
|---|---|---|
| MARY HATHAWAY | ) | |
| | ) | |
| v. | ) | No. 3:14-01768 |
| | ) | Judge Nixon/Brown |
| CAROLYN W. COLVIN, | ) | |
| ACTING COMMISSIONER | ) | |
| OF SOCIAL SECURITY | ) | |

To: The Honorable John T. Nixon, Senior United States District Judge.

### REPORT AND RECOMMENDATION

This action was brought under 42 U.S.C. §§ 405(g) and 1383(c) for judicial review of the final decision of the Social Security Administration through its Commissioner, denying plaintiff's applications for Disability Insurance Benefits (DIB) under Title II of the Social Security Act ("the Act"), 42 U.S.C. §§ 416(i) and 423(d), and Supplemental Security Income (SSI) under Title XVI of the Act, 42 U.S.C. §§ 1381, *et seq*. For the reasons explained below, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 15) be **DENIED** and the Commissioner's decision **AFFIRMED**.

### I. PROCEDURAL HISTORY

Plaintiff filed applications for SSI and DIB on April 18 and 29, 2011 respectively (Doc. 10, pp. 138-51),[1] amending her original disability onset date from March 22 to June 21, 2011 (Doc. 10, pp. 36-37, 171). Plaintiff claimed she was unable to work because of numbness in her hands, arthritis, tennis elbow, carpal tunnel syndrome, and lupus. (Doc. 10, pp. 88-89, 176)

Plaintiff's applications for benefits were denied initially on July 20, 2011, and upon reconsideration on November 9, 2011. (Doc. 10, pp. 77-80, 84-89, 93-97) On December 21, 2011,

---

[1] References to page numbers in the Administrative Record (Doc. 10) are to the page numbers that appear in the lower right corner of each page.

plaintiff requested a hearing before an administrative law judge (ALJ). (Doc. 10, pp. 99-100) A hearing was held on February 6, 2013 before ALJ Barbara Kimmelman. (Doc. 10, pp. 30-55) Plaintiff was represented by attorney Robert Parker at the hearing. (Doc. 10, p. 30)

The ALJ entered an unfavorable decision on March 29, 2013. (Doc. 10, pp. 10-29) Plaintiff filed a request with the Appeals Council on May 14, 2013 to review the ALJ's decision. (Doc. 10, pp. 7-9) The Appeals Council denied plaintiff's request on June 25, 2014, whereupon the ALJ's decision became the final decision of the Commissioner. (Doc. 10, pp. 1-6)

Plaintiff brought this action through counsel on August 28, 2014. (Doc. 1) Plaintiff filed a motion for judgment on the administrative record on January 13, 2015 (Doc. 15), and the Commissioner responded on February 9, 2015 (Doc. 16). Plaintiff did not file a reply to the Commissioner's response. This matter is now properly before the court.

## II. REVIEW OF THE RECORD[2]

### A. Medical Evidence

Doctor Deborah Morton, M.D., examined plaintiff consultively on June 21, 2011. (Doc. 10, pp. 307-15) Plaintiff's musculoskeletal and neurological exams were unremarkable. (Doc. 10, p. 309) Doctor Morton observed that plaintiff "was able to get out of the chair unassisted . . . did not use an assistive device . . . [but] her gait was slightly wide and she waddled," although Dr. Morton was unsure whether plaintiff waddled because of pain or "body habitus."[3] Plaintiff "was able to go for about eight steps" tandem walking, "could stand on her toes . . . [and] rock back on her heels." Straight leg raises were negative, although plaintiff "stated it . . . caused knee pain." Plaintiff's

---

[2] The excerpts of the medical record and hearing transcript addressed below are those necessary to support the court's analysis of plaintiff's claims of error. The remainder of the medical record and transcript of the hearing are incorporated herein by reference.

[3] Habitus – "posture or position of the body . . . physique; body build and constitution." *Dorland's Illustrated Medical Dictionary* 815 (32nd ed. 2012).

2

Romberg[4] test was negative, her strength in both her upper and lower extremities was 4+ out of 5, and her "[s]ensation was normal." Cervical spine range of motion (ROM) was normal, as were plaintiff's dorsolumbar[5] lateral flexion, elbows, wrists, hips, knees, and ankle ROM. Dorsolumbar spine flexion was 60, and right extension 15.[6]

Doctor Morton concluded that plaintiff was able to lift and/or carry up to 10 lbs. frequently, 20 lbs. occasionally, but never more than 20 lbs. due to reduced ROM of the arms/back and grip strength. (Doc. 10, p. 310) Doctor Morton assessed that plaintiff was able to sit only 1 hour at a time, stand and/or walk only 20-30 minutes at a time, sit 4 hrs. total in an 8-hr. workday, and stand and/or walk only 2 hrs. in an 8-hr. workday. (Doc. 10, p. 311) Although she assessed that plaintiff was able to handle, finger, feel, push/pull, and operate foot controls with either foot frequently during an 8-hr. workday, Dr. Morton concluded that plaintiff could never reach in any direction. (Doc. 10, pp. 311-12) Doctor Morton assessed that plaintiff could climb stairs, ramps, ladders, and scaffolds and balance occasionally, but stoop, kneel, crouch, and crawl only frequently. (Doc. 10, p. 312)

Doctor Frank Pennington, M.D., completed a physical residual functional capacity (RFC) assessment on July 15, 2011. (Doc. 10, pp. 316-24) Doctor Pennington determined from a review of the record that plaintiff could: 1) lift 50 lbs. occasionally and 25 lbs. frequently; 2) stand and/or walk about 6 hrs. in a normal 8-hr. workday with normal breaks; 3) sit about 6 hrs. in an 8-hr. workday with normal breaks; 4) push/pull, including hand and/or foot controls without limitation

---

[4] Romberg sign – "swaying of the body or falling when standing with the feet close together and the eyes closed . . . ." *Dorland's* at 1715. A negative test means the test was normal.

[5] Dorsolumbar – "pertaining to the back and the loins, especially the region of the lower thoracic and upper lumbar vertebrae." *Dorland's* at 563.

[6] Normal dorsolumbar flexion is 80-90 degrees, and extension is 30 degrees. http://www.ssas.com/disability-medical-tests/musculoskeletal/range-of-motion-test/.

3

during an 8-hr. workday. (Doc. 10, p. 317) Doctor Pennington assessed plaintiff with the ability to climb ramps/stairs, balance, stoop, kneel, crouch, and crawl frequently, but climb ladders/ropes/scaffolds only occasionally. (Doc. 10, p. 318) Doctor Pennington determined that plaintiff was limited in her ability to reach in all directions, but that her ability to handle, finger, and feel were not limited. (Doc. 10, p. 319) Doctor Pennington opined that Dr. Morton's assessment was "too restrictive based on the objective findings at the time of [her examination]." (Doc. 10, p. 322)

On October 13, 2011, Dr. Carolyn Parrish, M.D., affirmed Dr. Pennington's RFC assessment as written. (Doc. 10, p. 325) Thereafter, Dr. Parrish completed a second RFC assessment on November 8, 2011. (Doc. 10, pp. 326-34) Doctor Parrish's assessment mirrored Dr. Pennington's assessment in all respects.

Doctor Arikana Chihombori, M.D., plaintiff's primary care physician at the Bell Family Medical Center (BFMC), ordered a MRI of plaintiff's lumbar spine on January 5, 2012 which was performed on January 10, 2012. (Doc. 10, pp. 266, 561-63) The MRI showed spinal alignment "[w]ithin normal limits," and L1-2 showed "[m]oderate disc degeneration without canal stenosis[7] or foraminal[8] stenosis . . . [with] . . . moderate facet hypertrophy [9] bilaterally . . [with] . . . [n]o nerve root impingement or disc protrusion." (Doc. 10, p. 561) The MRI showed "[m]ild disc degeneration" at L2-3 "with bilateral mild facet[10] hypertrophy, worse on the right . . . [n]o canal

---

[7] Spinal stenosis – "narrowing of the vertebral canal, nerve root canals, or intervertebral foramina of the lumbar spine caused by encroachment of bone upon the space . . ." *Dorland's* at 1770.

[8] Foramen – "a natural opening or passage, especially one into or through a bone." *Dorland's* at 729.

[9] Hypertrophy – "the enlargement or overgrowth of an organ or part due to an increase in size of its constituent cells." *Dorland's* at 898.

[10] Facet – "a small plane surface on a hard body, as on a bone . . . ." *Dorland's* at 668.

4

stenosis or foraminal stenosis . . . [n]o focal disc protrusion or root impingement . . . demonstrated," and '[m]ild disc degeneration without canal stenosis or foraminal stenosis . . . [m]ild facet hypertrophic changes . . . [n]o focal disc protrusion" at L3-4. Doctor Chihombori diagnosed plaintiff with "lumbar radiculopathy"[11] based on the MRI. Doctor Chihombori reviewed the results of the MRI with plaintiff on January 19, 2012. (Doc. 10, p. 557)

Six-plus months after the MRI discussed above, Dr. Chihombori completed a medical source statement (MSS) on July 23, 2012. (Doc. 10, pp. 351-56) Doctor Chihombori assessed plaintiff as: 1) able to lift and/or carry up to 10 lbs. frequently and 20 lbs occasionally, but never more than 20 lbs.; 2) able to sit 1 hr. at a time/total in an 8-hr. workday without interruption, stand and/or walk for not more than 30 mins. at a time, but that she did not require a cane to ambulate. (Doc. 10, p. 352) Doctor Chihombori based the foregoing limitations on "severe osteoarthritis[12] lower back knees & hips – elbows & hands morbid obesity." (Doc. 10, p. 352)

Doctor Chihombori assessed that plaintiff could occasionally reach with both hands in all directions, handle, finger, feel, push, and pull, these restrictions being due to "arthritis both hands & elbows," and operate foot controls with both feet, those limitations due to "arthritis both ankles & knees." (Doc. 10, p. 353) As for postural limitations, Dr. Chihombori assessed plaintiff as able to climb stairs and ramps occasionally, but never ladders or scaffolds, and she could never balance, stoop, kneel, crouch or crawl, all of these limitations due to "arthritis of the hands knees and ankles." (Doc. 10, p. 354) Doctor Chihombori also assessed plaintiff as able to perform the following daily

---

[11] Lumbar radiculopathy – "any disease of lumbar nerve roots, such as from disk herniation or compression by a tumor or bony spur, with lower back pain and often paresthesia ['an abnormal touch sensation, such as burning . . . [or] . . . prickling . . . .']." *Dorland's* at 1383, 1571.

[12] Osteoarthritis – "a noninflammatory degenerative joint deisease seen mainly in oleder persons, characterized by degeneration of the articular cartilage, hypertrophy of bone at the margins, and changes in the synovial [a joint that provides more or less free movement] membrane . . . ." *Dorland's* at 1344, 1856.

5

activities: shop "us[ing] a scooter in the store,"[13] ambulate without the need for assistive devices, walk a block "slowly" on rough and/or uneven surfaces, use public transportation, climb a few steps at a reasonable pace using a single handrail, prepare a simple meal and feed herself, care for her personal hygiene, sort, handle, and use papers [*sic*]." (Doc. 10, p. 356) Doctor Chihombori determined, however, that plaintiff was not able to travel without a companion.

Plaintiff presented for treatment to BFMC on October 26, 2012, complaining that she had been experiencing "severe left knee pain for several weeks."[14] (Doc. 10, p. 496) Plaintiff completed a pain questionnaire indicating that: 1) the pain was continuous but worse in the evening; 2) her medication helped; 3) walking made the pain worse; 4) the side effects of the medication she was taking ranged from 0 to 5 on a scale from 0 to 10 where 0 was barely noticeable and 10 was severe enough to stop taking the medicine; 5) her pain was "moderate" at the time she completed the pain questionnaire; 6) on a scale of 0 to 10, where 0 does not interfere and 10 completely interferes, plaintiff rated the effect of her pain on her ability to concentrate 0, her relationships with other people 4, general activity, sleep, and enjoyment of life 5, but she did not score the effect of the pain on her mood or her ability to do "normal work"; 7) she could look after herself "normally," but doing so caused "extra pain"; 9) she could "not lift or carry anything at all"; 10) she could not walk for more than 1/4 mi., sit for more than ½ hr. or stand for more than 30 mins. (Doc. 10, pp. 498-502) X-rays taken that day indicated degenerative joint disease of the left knee. (Doc. 10, p. 503)

Plaintiff presented to Dr. Chihombori on November 26, 2012 for leg and lower back pain,

---

[13] Plaintiff presented to Dr. Chihombori on July 23, 2012 for her disability physical examination. (Doc. 10, p. 538) Doctor Chihombori noted in her clinical notes dated that same day that plaintiff "uses a scooter to shop." (Doc. 10, p. 538) The ALJ concluded that Dr. Chihombori "may have" completed the MSS based on plaintiff's subjective inputs, because Dr. Chihombori used the scooter-to-shop terminology in her MSS.

[14] In the accompanying "PATIENT COMFORT ASSESSMENT GUIDE" (pain questionnaire) plaintiff writes that she had been experiencing the current level of pain for "3 weeks." (Doc. 10, p. 498) Based on this 3-week figure, plaintiff is deemed to have begun experiencing "severe left knee pain" at the beginning of October 2012.

as well as worsening left knee pain. (Doc. 10, p. 494) Plaintiff completed a pain questionnaire that same day in which she indicated: 1) that the pain was worse at nighttime without indicating the duration or frequency (Doc. 10, p. 490); 2) medication made her pain better; 3) walking, standing, and/or bending made her pain worse; 4) on a scale of 0 to 10, where 0 does not interfere and 10 completely interferes, she rated general activity, mood, sleep, enjoyment of life, ability to concentrate, relations with other people as 4-5, but that pain completely interfered with her ability to do normal work; 5) her pain prevented her from sitting or standing more than 1 hr. at a time; 6) she was unable to "lift heavy weights"; 7) her pain was "moderate" at the time of the assessment; 8) she could look after herself "normally," but doing so caused "extra pain"; 9) she could "not lift heavy weights"; 10) she could not walk more than 1/4 mi. (Doc. 10, pp. 490-93) On examination, plaintiff exhibited "pain with palpation [of] left knee," and reduced ROM of left knee. (Doc. 10, p. 494) Doctor Chihombori ordered a MRI of plaintiff's left knee on November 26, 2012 to rule out osteoarthritis. (Doc. 10, pp. 487, 494)

A MRI was performed on plaintiff's left knee on November 28, 2012. (Doc. 10, pp. 485-86) The lateral meniscus showed an "[o]blique horizontal tear of the posterior horn with considerable degeneration of the anterior horn and no involvement of the root or body of the meniscus," and the medial meniscus showed a "[c]omplex oblique horizontal tear of the posterior horn without involvement of the body. Moderate degeneration of the body and anterior horn." (Doc. 10, p. 485) The joint space showed "[s]mall joint effusion,"[15] the medial collateral ligament, lateral collateral ligament, quadriceps tendon, and extensor mechanism all were intact, and the dorsal patellar articular cartilage showed mild diffuse degeneration without focal defect of subchondral[16] bony

---

[15] Effusion – "the escape of fluid into a part or tissue . . . ." *Dorland's* at 595.

[16] Subchondral – "beneath a cartilage . . . ." *Dorland's* at 1791.

abnormality. Doctor Chihombori diagnosed plaintiff with "medial & lateral meniscus tears."

## B. Hearing

Plaintiff used a cane at the hearing, and was wearing a knee brace, both of which she testified had been prescribed by her doctors. (Doc. 10, pp. 41, 43) She testified that she began using the cane "[a]bout six weeks" before the hearing, but did not indicate when she began wearing the knee brace.[17] (Doc. 10, pp. 42-43) When asked by counsel if she had problems with both her knees, plaintiff replied "My left knee." (Doc. 10, p. 42) Plaintiff testified that, "when I go to get up my knees pop like and crack like I'm going to fall . . . sometime I have to stand up first and then go to walking because if I don't it'll make me like I fall down." She also testified that she could not bend down because of her knee. (Doc. 10, p. 43) When counsel asked whether she had spoken with the doctor about the results of the MRI, plaintiff testified that she had not.

Plaintiff testified when asked by counsel that she could sit comfortably for "[a]bout 30 minutes," that she could stand "[a]bout 20, maybe 25 minutes," and that she could "walk like a block or maybe two block[s]," but it would take her probably "about 15, 20 minutes, 30 maybe." (Doc. 10, p. 44) Plaintiff testified that she helped with chores around the house "sometimes," that she could put her clothes in the washer "sometimes," and that she could load the dishwasher. (Doc. 10, p. 45) She also testified that she had difficulty putting her pants on, and toileting herself.

Upon questioning by the ALJ, plaintiff testified that was able to sweep the floor at home, and

---

[17] As discussed above at p. 2, Dr. Morton noted that plaintiff did not require an assistive device during the June 2011 examination, and at p. 5, Dr. Chihombori noted in July 2012 that plaintiff did not require a cane to ambulate. The 6-week figure to which plaintiff referred at the hearing corresponds to December 26, 2012, the date when Dr. Chihombori ordered the MRI of plaintiff's left knee. There is nothing in the November 26, 2012 progress note that indicates Dr. Chihombori prescribed a cane and/or a knee brace at the time she ordered the MRI. Moreover, as discussed above, plaintiff testified at the hearing that she had not seen a doctor/received medical treatment since the MRI. There is nothing in the medical record that shows plaintiff was prescribed a cane and/or knee brace by any other medical source between the time of the MRI and the hearing. In short, the record does not support plaintiff's sworn testimony that she was prescribed the cane and knee brace.

do the dishes. (Doc. 10, p. 47) She also testified that she could make "a sandwich or something . . . on the stove with a skillet." Plaintiff testified further that she watched television, went to the store to buy groceries with her daughter and/or mother, that she went to church "[s]ometimes," that she had a driver's license and was able to drive, and that she "sometimes" went to her cousins house where they talked and watched television. (Doc. 10, pp. 47-49) When the ALJ asked "what would prevent [her] from working the most," plaintiff answered: difficulty in bending because of her back, and her inability to grip with her right hand. (Doc. 10, p. 49)

Counsel posed questions to the VE pertaining to the following limitations identified in Dr. Chihombori's MSS: the inability to reach in any direction, and the 30 min. sitting/standing limitations. (Doc. 10, pp. 53-54) Counsel asked the VE no other questions.

### C. The ALJ's Notice of Decision

Under the Act, a claimant is entitled to disability benefits if she can show her "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); 20 C.F.R. §§ 404.1505, 416.905. Corresponding regulations outline the five-step sequential process to determine whether an individual is "disabled" within the meaning of the Act. *See* 20 C.F.R. §§ 404.1520(a)(4), 416.920(a)(4); *Gayheart v. Comm'r of Soc. Sec.*, 710 F.3d 365, 374-75 (6th Cir. 2014). While the claimant bears the burden of proof at steps one through four, the burden shifts to the Commissioner at step five to identify a significant number of jobs in the economy that accommodate the claimant's residual functional capacity (RFC) and vocational profile. *Johnson v. Comm'r of Soc. Sec.*, 652 F.3d 646, 651 (6th Cir. 2011).

### III. ANALYSIS

## A. Standard of Review

The district court's review of the Commissioner's final decision is limited to determining whether the Commissioner's decision is supported by substantial evidence in the record, and whether the decision was made pursuant to proper legal standards. 42 U.S.C. § 405(g); *Gayheart*, 710 F.3d at 374. Substantial evidence is less than a preponderance but more than a scintilla; it refers to relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Richardson v. Perales*, 402 U.S. 389, 401 (1971); *see Gentry v. Comm's or Soc. Sec'y*, 741 F.3d 708, 722 (6th Cir. 2003). The Commissioner's decision must stand if substantial evidence supports the conclusion reached, even if the evidence also could support a different conclusion. *Gayheart*, 710 F.3d at 374. "The findings of the Commissioner . . . as to any fact, if supported by substantial evidence, shall be conclusive . . . ." 42 U.S.C. § 405(g); *see McClanahan v. Comm'r of Soc. Sec.*, 474 F.3d 830, 833 (6th Cir. 2006).

## B. Claims of Error

### 1. Whether the ALJ Erred in Not Giving the Opinion of Treating Physician, Dr. Chihombori, Controlling Weight (Doc. 15-1, pp. 6-8 of 13)[18]

Plaintiff argues that the ALJ "provided no good reasons" for rejecting Dr. Chihombori's opinion. (Doc. 15-1, p. 8 of 13) Plaintiff asserts that Dr. Chihombori's opinion was supported by the January 10, 2012 MRI of her lumbar spine, and the November 28, 2012 MRI of her left knee.

Under the standard commonly called the "treating physician rule," the ALJ is required to give a treating source's opinion "controlling weight" if two conditions are met: the opinion "is well-supported by medically acceptable clinical and laboratory diagnostic techniques"; and the

---

[18] Plaintiff did not number the pages in her motion for judgment on the administrative record as required under LR.7.03(a), Local Rules of Court. Therefore, the page numbers assigned by the court's CM/ECF system will be used.

opinion "is not inconsistent with the other substantial evidence in [the] case record." *Gayheart*, 710 F.3d at 376 (quoting 20 C.F.R. § 404.1527(c)(2)). However, the ALJ "is not bound by a treating physician's opinions, especially when there is substantial medical evidence to the contrary." *Cutlip v. Sec'y of Health and Human Serv's*, 25 F.3d 284, 287 (6th Cir. 1994). If the Commissioner does not give a treating-source opinion controlling weight, then the opinion is weighed based on the length, frequency, nature, and extent of the treatment relationship, as well as the treating source's area of specialty and the degree to which the opinion is consistent with the record as a whole and is supported by relevant evidence. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. §§ 404.1527(c)(2)-(6)).

The ALJ is required to provide "good reasons" for discounting the weight given to a treating-source opinion. *Gayheart*, 710 F.3d at 376 (citing 20 C.F.R. § 404.1527(c)(2)). These reasons must be "supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." *Gayheart*, 710 F.3d at 376 (quoting SSR 96–2p, 1996 WL 374188 at *5 (SSA)). This procedural requirement "ensures that the ALJ applies the treating physician rule and permits meaningful review of the ALJ's application of the rule." *Gayheart*, 710 F.3d at 376 (quoting *Wilson v. Comm's of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004)).

That part of the decision pertaining to the weight the ALJ gave to Dr. Chihombori's medical source statement is quoted below:

> Dr. Chihombori, the claimant's primary care physician, opined on July 23, 2012, that the claimant could lift up to 20 pounds occasionally and up to ten pounds frequently, that she could sit for one hour at one time without interruption, for a total of one hour, and could stand and walk for 30 minutes each at one time for a total of 30 minutes, that she did not require a cane to ambulate, but she based

11

this on 'severe osteoarthritis' of her lower back, knees and hip, elbows and hands, as well as morbid obesity' (Exhibit B8F). She further opined that the claimant could only occasionally use her bilateral upper extremities for any functions due to 'arthritis both hands and elbows' (Exhibit B8F). However, the record does not confirm arthritis in all of these joints, though she does have problems with her left knee, as discussed above. She limited the claimant to occasional use of bilateral foot controls due to arthritis in knees and ankles, with no verification of arthritis in these locations either. She precluded all postural activities except occasional climbing stairs and ramps due to arthritis of the hands, knees and ankles. And she imposed environmental restrictions against hazards, humidity and wetness, temperature extremes and vibration, as well as more than moderate noise, with no explanation given. It appears that Dr, Chihombori may have indicated what the claimant told her, because she noted that the claimant 'uses a scooter in the store.' Id. Not only does the record not confirm the extent of arthritis this assessment apparently is based upon, no treatment records or exam findings support this assessment or the extent of arthritis suggested. In fact, the day of 'disability exam' July 23, 2012, the treatment notes indicate that her musculoskeletal exam was 'WNL[]' and her extremities were 'WNL' as was her neurological exam 'WNL' (Exhibit B11F). Furthermore, her admitted activities do not support the restriction of only sitting for one hour, and standing and walking for a total of 30 minutes each. The claimant said she helps with chores, including laundry and putting the dishes in the dishwasher, and she sometimes washes dishes, cooks, sweeps the floor, and makes sandwiches. She watches movies on television, goes to church sometime, and goes to the grocery store if someone goes with her. She has a driver's license and said she is able to drive. She goes to her cousin's house to stay a while to talk and watch television. She said she looked for work while she was drawing unemployment, and could not find jobs and has not looked since. She said the problem which prevented her from working the most was bending and her hands, but she said her right hand was the only problem. She admitted that she had surgery on her right hand in 2007 and returned to work until 2008. According to her testimony, she stopped working because the company she was working for relocated and she was laid off.

Based on the record as a whole, including the claimant's activities, imaging studies, and clinical exam findings, as well as treatment records, Dr. Chihombori' s assessment is not supported and is given no weight except to the extent that the claimant can lift and carry 20

pounds occasionally and ten pounds frequently.

(Doc. 10, pp. 20-21) As shown above, the ALJ gave a good reason for not giving Dr. Chihombori's opinion controlling weight. The next question is whether the ALJ's decision was supported by substantial evidence. Plaintiff has limited the scope of the court's inquiry in this claim of error to the following argument: the MRIs of plaintiff's lower back and left knee support the MSS completed by Dr. Chihombori. (Doc. 15-1, p. 8 of 13)

Turning first to the MRI of plaintiff's lower back, Dr. Chihombori ordered the MRI, diagnosed plaintiff with lumbar radiculopathy based on that MRI, and subsequently reviewed the results of the MRI with plaintiff in-clinic. It is obvious from the record that Dr. Chihombori possessed intimate knowledge of plaintiff's lower back problems, including the results of, and inferences to be drawn from, the MRI and the diagnosis resulting therefrom. It also is obvious from the record that Dr. Chihombori diagnosed plaintiff with lumbar radiculopathy based on that MRI sufficiently far enough in advance – more than 6 months – to have attributed the limitations in the MSS – all or in part – to lumbar radiculopathy. She did not. Instead, Dr. Chihombori's medical opinion was that plaintiff's limitations – as reported in the MSS – were due solely to "severe osteoarthritis" and "morbid obesity." Inasmuch as lumbar radiculopathy and osteoarthritis are different conditions, the former does not support the latter. Moreover, to attribute plaintiff's limitations in the MSS to lumbar radiculopathy in view of Dr. Chihombori's documented opinion to the contrary would be to put words impermissibly into Dr. Chihombori's mouth. *Expression unius est exclusio alterius* – "the expression of one thing is to the exclusion of the other." *See e.g., U.S. v. Waters*, 158 F.3d 933, 939 (6th Cir. 1998).

Turning next to the November 28, 2012 MRI of plaintiff's knee, the ALJ addressed it as follows:

13

> [On October 26, 2012, plaintiff] indicated she had sharp, throbbing, continuous knee pain. However, she said medication helped with the pain (Exhibit B11F). October 26, 2012, she reported only moderate pain, but said it prevented her from lifting or carrying anything at all and from walking more than one quarter of a mile. Id. That same day she complained of pain in her left knee, and an MRI of the left knee (November 28, 2012) revealed medial and lateral meniscal tears in the posterior horns that were more pronounced medially. Additionally, there was medial and lateral meniscal degeneration and small joint effusion (Exhibit B12F). However, on November 26, 2012, she reported . . . that the pain was moderate not severe, and that she could look after herself normally but it causes pain. She also reported only that she could not lift heavy objects, and again reported that she could not walk more than a quarter of a mile. Id. The claimant has left knee problems, which were considered in giving the ability to alternate positions. Further, this condition is expected to improve with treatment.

(Doc. 10, p. 19) For reasons previously noted, a diagnosis of "medial & lateral meniscus tears" does not support Dr. Chihombori's MSS based on "severe osteoarthritis." These conditions are, once again, not the same thing. That said, the question becomes whether plaintiff's left knee issues constitute independent grounds for granting benefits. The short answer is, "No."

As previously noted above at p. 9, "a claimant is entitled to benefits if she can show her 'inability to engage in any substantial gainful activity by reason of any medically determinable physical . . . impairment which . . . has lasted or can be expected to last for a continuous period of not less than 12 months.'" The "extreme pain" in plaintiff's left knee that gave rise to the x-rays and MRI on November 26, 2012 began in the first part of October 2012. Giving plaintiff the maximum benefit of the doubt that the "extreme pain" began on October 1, 2012, and that the pain was continuous from that date onward, any knee-related condition would have existed for scarcely more than 4 months at the time of the hearing on February 6, 2013, and less than 6 months on the date the ALJ entered her decision on March 29, 2013. This is not a year. There also is nothing in the record from which it may be concluded that the pain/limitations attributed to plaintiff's left knee would last

14

for at least 12 months from the original onset date, *i.e.*, until October 1, 2013. By plaintiff's own admission, she had not seen a doctor concerning the results of the MRI at the time of the hearing, nor is there anything in the medical records submitted following the hearing that shows she received treatment for her knee, much less that a medical professional determined the pain/limitations would last a year, *i.e.*, through October 1, 2013. Finally, the ALJ noted that plaintiff's knee "is expected to improve with treatment." (Doc. 10, p. 19) Comparing the two pain questionnaires discussed above at pp. 6-7, plaintiff's limitations due to her left knee already had begun to improve even before the MRI.

As shown above, the ALJ gave good reasons for discounting Dr. Chihombori's opinions, and those reasons are supported by substantial evidence. Plaintiff's first claim of error is without merit.

### 2. Whether the ALJ Erred in Considering the Opinion of Consultive Examiner, Dr. Morton
### (Doc. 15-1, p. 9 of 13)

Plaintiff argues that the ALJ erred in "failing to provide sufficient reasons for giving significant weight to Dr. Morton's opinion yet rejecting the one portion that was favorable to Plaintiff." (Doc. 15-1, p. 9 of 13)

"[A]n ALJ is procedurally required to 'give good reasons . . . for the weight [she gives a] treating source's opinion.'" *Ealy v. Comm'r of Soc. Sec.*, 594 F.3d 504, 514 (6th Cir. 2010)(citing *Smith v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007)). However, "this requirement only applies to treating sources." *See Ealy*, 594 F.3d at 514 (citing *Smith*, 482 F.3d at 876). Indeed, the ALJ is not required to explain her reasons for the weight she gives to the opinion of nontreating, examining sources. *See Norris v. Comm'r. of Soc. Sec.*, 461 Fed.Appx. 433, 439 (6th Cir. 2012)("[A]n ALJ need only explain [her] reasons for rejecting a treating source statement because such an opinion carries 'controlling weight.'")(citing *Smith*, 482 F.3d at 876 ("[T]he SSA requires

ALJs to give reasons for only *treating* sources." (italics for emphasis in the original)).

The ALJ discussed her treatment of Dr. Morton's opinion at length in the decision. (Doc. 10, pp. 16, 18, 20) As shown above, however, the ALJ was not required to explain why she treated Dr. Morton's opinion the way she did. Plaintiff's second claim of error is without merit.

### 3. Whether the ALJ Erred in Not Considering All of Plaintiff's Impairments and for Not Providing Sufficient Reasons for Not Finding That All of Her Impairments Were Severe (Doc. 15-1, pp. 9-10 of 13)

Plaintiff makes the following three-part argument in the context of this claim of error: 1) the ALJ erred in not finding that osteoarthritis, peripheral neuropathy, and edema were severe impairments; 2) the ALJ failed to "sufficiently state why she did not find them to be severe"; 3) the ALJ failed to consider plaintiff's obesity as required under SSR 02-1P.

The ALJ noted the following severe impairments in the decision: "history of right elbow tendinitis status-post surgery, history of right carpal tunnel syndrome ('CTS') status-post surgery, hypertension, obesity, degenerative changes of the lumbar spine; a recent (October 2012) diagnosis of lateral and medial meniscus tears of the left knee; and obstructive sleep apnea (corrected with CPAP) . . . ." (Doc. 10, ¶ 3, p. 16) The ALJ did not include osteoarthritis, peripheral neuropathy, and edema as severe impairments.

Assuming without deciding that the ALJ should have included osteoarthritis, peripheral neuropathy and edema as severe impairments, the ALJ's failure to do so constitutes harmless error because, as noted above, the ALJ determined that plaintiff had other severe impairments that permitted plaintiff to clear step 2. *See Anthony v. Astrue*, 266 Fed.Appx. 451, 457 (6th Cir. 2008)(citing *Maziarz v. Sec'y of Health & Human Servs.*, 837 F.2d 240, 244 (6th Cir. 1987)(failure to find that an impairment was severe at step 2 is harmless error, and "legally irrelevant," where

other impairments are deemed severe). Because the ALJ's failure to include these three additional limitations as severe impairments constitutes harmless error, that part of plaintiff's argument is without merit, as is her parallel argument that the ALJ did not explain sufficiently why she determined they were not severe impairments.

As for plaintiff's obesity, "[a]lthough obesity [i]s no longer a separately listed impairment under step three, the Commissioner [has] explained that obese claimants can still prevail at step three by proving that their obesity combined with other ailments equals the severity of a different listed impairment." *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 644 (6th Cir. 2006)(citation omitted). However, SSR 02–01p does not require the ALJ to use any "particular mode of analysis," but merely directs an ALJ to consider the claimant's obesity, in combination with other impairments, at all stages of the sequential evaluation. *Shilo v. Comm'r of Soc. Sec.*, 600 Fed.Appx. 956, 959 (6th Cir. 2015) (citing *Bledsoe v. Barnhart*, 165 Fed.Appx. 408, 411-12 (6th Cir. 2006)).

The ALJ determined at step three that plaintiff's obesity was a severe impairment. (Doc. 10, ¶ 3, p. 16) The ALJ addressed plaintiff's obesity as follows:

> Concerning the claimant's obesity, the claimant's height was reported to be 62 inches, and her weight 209 pounds in October 2012, therefore she is obese (Exhibit B11F). As required by the regulations, the undersigned considered that obesity can cause limitation in function in any of the exertional functions such as sitting, standing, walking, lifting, carrying, pushing and pulling. It may also affect the ability to do postural functions, such as climbing, balancing, stooping and crouching. The ability to manipulate may be affected by the presence of adipose tissue in the hands and fingers. The combined effects of obesity with musculoskeletal impairments can be greater than the effects of each of the impairments considered separately. In terms of the claimant's obesity, reducing the occupational base to the RVC described in finding 5 adequately accounts for any symptoms reasonably arising from this impairment.

(Doc. 10, p. 20) As shown above, the manner in which the ALJ addressed plaintiff's obesity

17

complied with the regulations.

None of plaintiff's three arguments in support of her third claim of error have any merit. Consequently, plaintiff's third claim of error is without merit.

### 4. Whether the ALJ Erred in Not Providing a Function-by-Function Assessment in the RFC in Accordance With SSR 96-8p (Doc. 15-1, pp. 10-11 of 13)

Plaintiff argues that the ALJ failed to perform a function-by-function assessment of her limitations, and that she failed to include substantial limitations in the RFC. (Doc. 15-1, p. 11 of 13)

Social Security Ruling 96-8p requires the ALJ to make a function-by-function assessment of her alleged limitations. However, "'[a]lthough a function-by-function analysis is desirable, SSR 96-8p does not require ALJs to produce such a detailed statement in writing,' as there is a difference 'between what an ALJ must consider and what an ALJ must discuss in a written opinion.'" *Beason v. Comm'r of Soc. Sec.*, 2014 WL 4063380 * 13 (E.D. Tenn. 2014)(citing *Delgado v. Comm'r of Soc. Sec.*, 30 Fed.Appx. 542, 547 (6th Cir. 2002)). More particularly, SSR 96-8p "does not state that the ALJ must discuss each function separately in the narrative of the ALJ's decision." *Beason*, 2014 WL at *13.

A plain reading of the ALJ's decision shows that she did not compare and contrast each of plaintiff's alleged limitations in her narrative. As shown above, SSR 96-8p did not require her to. The ALJ did, however, make numerous references to having taken the entire record into consideration in reaching her decision: "After careful consideration of all the evidence . . . ." (Doc. 10, p. 14); "After careful consideration of the entire record . . . ." (Doc. 10, p. 15); "**After careful consideration of the entire record** . . . ." (Doc. 10, p. 17)(bold in the original); "After careful consideration of the evidence . . . ."; "Based on the record as a whole . . . ." (Doc. 10, p. 21); "The undersigned has carefully read and considered all the evidence of record . . . ." (Doc. 10, p. 22).

The statements above, as well as the ALJ's detailed RFC analysis complied with SSR 96-8p within the meaning of *Delgado* and *Beason*. Plaintiff's fourth claim of error is without merit.

## IV. RECOMMENDATION

For the reasons explained above, the undersigned **RECOMMENDS** that plaintiff's motion for judgment on the administrative record (Doc. 15) be **DENIED** and the Commissioner's decision **AFFIRMED**. The parties have fourteen (14) days of being served with a copy of this R&R to serve and file written objections to the findings and recommendation proposed herein. A party shall respond to the objecting party's objections to this R&R within fourteen (14) days after being served with a copy thereof. Failure to file specific objections within fourteen (14) days of receipt of this R&R may constitute a waiver of further appeal. *Thomas v. Arn*, 474 U.S. 140, *reh'g denied*, 474 U.S. 111 (1986); *Cowherd v. Million*, 380 F.3d 909, 912 (6th Cir. 2004).

**ENTERED** this 30th day of October, 2015.

/s/ Joe B. Brown
Joe B. Brown
United States Magistrate Judge